EXHIBIT A

**Int. Cl.: 9**

**Prior U.S. Cls.: 21, 23, 26, 36, and 38**

## United States Patent and Trademark Office

**Reg. No. 3,268,924**
Registered July 24, 2007

## TRADEMARK
### PRINCIPAL REGISTER

# HDMI

HDMI LICENSING, L.L.C. (DELAWARE COR-PORATION)
1060 EAST ARQUES AVENUE, SUITE 100
SUNNYVALE, CA 94085

FOR: INTEGRATED CIRCUITS AND SEMICON-DUCTORS; COMPUTER SOFTWARE FOR USE AS AN INTERFACE BETWEEN AUDIO/VIDEO SOUR-CES AND AUDIO/VIDEO REPEATER DEVICES; COMPUTER SOFTWARE FOR USE AS AN INTER-FACE BETWEEN AUDIO/VIDEO SOURCES AND AUDIO/VIDEO MONITORS; COMPUTER SOFT-WARE INTERFACE FOR USE IN CONNECTING, CONTROLLING AND NETWORKING A WIDE VARIETY OF COMPUTER AND COMMUNICA-TIONS HARDWARE, CONSUMER ELECTRONIC DEVICES, COMPONENTS, AND PERIPHERALS; CONNECTORS, CABLES, AND COMPONENTS THEREOF; COMPUTER HARDWARE, HARD-WARE COMPONENTS, NAMELY COMPUTER MONITORS, AND PERIPHERALS; COMMUNICA-TIONS HARDWARE, HARDWARE COMPONENTS, NAMELY CABLE MODEMS, INTERNET GATE-WAYS, MULTIMEDIA SWITCHES, AND PERIPH-ERALS; CONSUMER ELECTRONICS DEVICES, NAMELY, CABLE, SATELLITE AND TERRES-TRIAL DIGITAL SET-TOP BOXES, DVD PLAYERS AND RECORDERS, DIGITAL VHS PLAYERS AND RECORDERS, PERSONAL VIDEO RECORDERS, CABLE BOXES, AUDIO/VIDEO RECEIVERS, INTE-GRATED TELEVISIONS, AND TELEVISION MONI-TORS, IN CLASS 9 (U.S. CLS. 21, 23, 26, 36 AND 38).

FIRST USE 12-0-2002; IN COMMERCE 12-0-2002.

SN 78-120,477, FILED 4-9-2002.

BARBARA BROWN, EXAMINING ATTORNEY

Int. Cl.: 9

Prior U.S. Cls.: 21, 23, 26, 36, and 38

**United States Patent and Trademark Office**

Reg. No. 3,442,135
Registered June 3, 2008

## TRADEMARK
## PRINCIPAL REGISTER



HDMI LICENSING, L.L.C. (DELAWARE COR-
PORATION)
1060 EAST ARQUES AVENUE, SUITE 100
SUNNYVALE, CA 94085

FOR: INTEGRATED CIRCUITS AND SEMICON-
DUCTORS; COMPUTER SOFTWARE FOR USE AS
AN INTERFACE BETWEEN AUDIO/VIDEO SOUR-
CES AND AUDIO/VIDEO REPEATER DEVICES;
COMPUTER SOFTWARE FOR USE AS AN INTER-
FACE BETWEEN AUDIO/VIDEO SOURCES AND
AUDIO/VIDEO MONITORS; COMPUTER SOFT-
WARE INTERFACE FOR USE IN CONNECTING,
CONTROLLING AND NETWORKING A WIDE
VARIETY OF COMPUTER AND COMMUNICA-
TIONS HARDWARE, CONSUMER ELECTRONIC
DEVICES, COMPONENTS, AND PERIPHERALS;
CONNECTORS, CABLES, AND COMPONENTS
THEREOF; COMPUTER HARDWARE, HARD-
WARE COMPONENTS, NAMELY, AND PERIPHER-
AL; COMMUNICATIONS HARDWARE,
HARDWARE COMPONENTS, NAMELY, CABLE
MODEMS, INTERNET GATEWAYS, MULTIMEDIA

SWITCHES, AND PERIPHERALS; CONSUMER
ELECTRONICS DEVICES, NAMELY, CABLES, SA-
TELLITE AND TERRESTRIAL DIGITAL SET-TOP
BOXES, DVD PLAYERS AND RECORDERS, DIGI-
TAL VHS PLAYERS AND RECORDERS, PERSONAL
VIDEO RECORDERS, CABLE BOXES, AUDIO/VI-
DEO RECEIVERS, INTEGRATED TELEVISIONS,
AND TELEVISIONS MONITORS, IN CLASS 9 (U.S.
CLS. 21, 23, 26, 36 AND 38).

FIRST USE 12-0-2002; IN COMMERCE 12-0-2002.

NO CLAIM IS MADE TO THE EXCLUSIVE
RIGHT TO USE "HIGH-DEFINITION MULTIME-
DIA INTERFACE", APART FROM THE MARK AS
SHOWN.

SN 78-129,379, FILED 5-16-2002.

MARTHA SANTOMARTINO, EXAMINING ATTOR-
NEY

# EXHIBIT B

HDMI SPECIFICATION
ADOPTER AGREEMENT

## High-Definition Multimedia Interface Specification
## ADOPTER AGREEMENT

**Certain Founders have developed a digital media interface specification:** *High-Definition Multimedia Interface™ v.1.x (or "HDMI™")* **and are offering a non-discriminatory license to implement HDMI.  This is a license agreement for parties wishing to adopt the HDMI Specification.**

This High-Definition Multimedia Interface Specification Adopter Agreement (the "Agreement") is made as of the Effective Date by and between the Agent and the Adopter as defined below.

**Adopter Contact Information**

| | |
|---|---|
| **Company Name:** | New Century optronics Co.,Ltd |
| **Contact Person:** | Xiong Qing Jie |
| **Title:** | Vice - General Manager |
| **Address:** | No.168 GongRen West Road, jiaojiangArea, Taizhoucity, zhejiang province, china |
| **Phone:** | +86-576-88869662 |
| **Email:** | xqj2002070|@163.com |

## 1. Definitions.

1.1    **"Adopter"** means the entity named as "Adopter" above and at the end of this Agreement. and includes the Affiliates of such entity.

1.2    **"Affiliate"** means with respect to any person or entity, an entity that now or hereafter directly or indirectly controls, is controlled by, or is under common control with such person or entity. "Control" means beneficial ownership of more than fifty percent (50%) of the voting stock or equity in an entity.  Such entity shall be considered an "Affiliate" only so long as such "control" exists.

1.3    **"Agent"** means the entity chosen to administrate the promotion and licensing of HDMI as the Founders may determine from time to time. As of the Effective Date of this Agreement, the Agent is HDMI Licensing, LLC.

1.4    **"Authorized Testing Center"** shall mean a testing center authorized by the Founders in writing for the testing of products or components thereof (whether a chip, subsystem, or end-user product) that claim conformance to the High-Definition Multimedia Interfaces or that bear any Adopted Trademarks.

1.5    **"Cable"** means a Fully Compliant cable.

1.6    **"Component"** means a device (whether hardware, software, or combination thereof) which implements a subset of the functionality required of a Sink, Source or Repeater.  The Component supplier must reasonably indicate to its customers the HDMI functionality supported by the Component.  Furthermore, it must be reasonably possible to design a Fully Compliant Sink, Source or Repeater utilizing the Component as indicated by the supplier.

1.7    **"Connector"** means a Fully Compliant connector.

**HDMI SPECIFICATION**
**ADOPTER AGREEMENT**

1.8    "**Effective Date**" shall mean the later date of the signatures set forth below.

1.9    "**Fellow Adopters**" means the Adopters who execute a copy of this Agreement and deliver it to the Agent, and includes the Affiliates of such Adopters.

1.10   "**Founders**" means Hitachi Ltd., a corporation of Japan, having a principal place of business in Tokyo, Japan, Panasonic Corporation., a corporation of Japan, having a principal place of business in Osaka, Japan, Philips Consumer Electronics International B.V., a corporation of The Netherlands, having a principal place of business in Amsterdam, The Netherlands, Silicon Image, Inc., a Delaware corporation having a principal place of business in Sunnyvale, California, USA, Sony Corporation, a corporation of Japan, having a principal place of business in Tokyo, Japan, Thomson multimedia S.A., a French corporation, having its principal place of business in Boulogne, France, and Toshiba Corporation, a corporation of Japan, having a principal place of business in Tokyo, Japan, and includes each of their Affiliates.

1.11   "**Fully Compliant**" means an implementation of all portions of the High-Definition Multimedia Interfaces required for a specific type of Licensed Product, and where such implementation has passed all applicable compliance testing procedures set forth in Section 6.

1.12   "**High-Definition Multimedia Interfaces**" means the electrical interfaces, mechanical interfaces, behavioral rules, signals, signaling and coding protocols, bus protocols, and any other items disclosed in, and required by, the Specification.  For purposes of clarification, if a Fellow Adopter implements a portion of a Specification designated in such Specification as optional, then all electrical interfaces, mechanical interfaces, signals, behavioral rules, signaling and coding protocols, bus protocols, and any other related items disclosed in, and required by, such Specification for such option, shall be deemed High-Definition Multimedia Interfaces.

1.13   "**HDMI Compliance Test Specification**" means the testing policies, procedures and equipment specifications set forth by the Founders to assist Fellow Adopters in verifying compliance of Licensed Products with the Specification, and as may be modified in writing from time to time by the Founders.

1.14   "**Licensed Product**" means a Cable, Component, Connector, Repeater, Source or Sink.

1.15   "**Minor Update**" means an update or revision to the Specification published by the Founders that corrects, clarifies, or enhances the Specification without adding any significant new features or functionality to the High-Definition Multimedia Interfaces, and in no way reduces interoperability between and among any versions of the High-Definition Multimedia Interfaces. Minor Updates shall be indicated by a change in the version number digits to the right of the decimal point (e.g., revisions 1.2, 1.3 … 1.9).

1.16   "**Necessary Claims**" means those claims of all patents, and patent applications to the extent such applications issue as patents, throughout the world entitled to an effective filing date prior to or during the term of this Agreement, which an entity or any of its Affiliates has the right, at any time during the term of this Agreement, to grant licenses of the scope granted herein, and which are necessarily infringed in order to implement and comply with the High-Definition Multimedia Interfaces, where such infringement could not have been avoided by another non-infringing implementation of such High-Definition Multimedia Interfaces (licensee shall have the burden of proof to establish that a claim falls within the scope this clause).  Necessary Claims shall not include, and no license shall apply to: (a) informative implementation examples included in the Specification; (b) claims, which if licensed, would require the payment of royalties by the licensor to third parties (except for payments to Affiliates or to employees within the scope of their employment); (c) claims relating to semi-conductor materials, semi-conductor manufacturing apparatus, semi-conductor manufacturing methods and semiconductor circuit

**HDMI SPECIFICATION**
**ADOPTER AGREEMENT**

designs; (d) claims relating to copy-protection technology (e) claims necessarily infringed to implement non-HDMI industry standards (including, without limitation, HDCP, E-DDC, E-EDID, I2C, CEA861B and Project 50) referenced in a Publicly Licensed Specification, except to the extent that such claims are necessarily infringed to implement and comply with those portions of High-Definition Multimedia Interfaces on the Licensed Products which do not implement or comply with corresponding non-HDMI industry standards; or (f) claims not necessarily infringed in implementing and complying with the High-Definition Multimedia Interfaces even if in the same patent as Necessary Claims.

1.17    **"Repeater"** means a Fully Compliant digital electronic device adapted to receive a digital data signal representative of video and/or audio data from a Source or Repeater and to switch and/or retransmit such video and/or audio data to a Repeater or Sink, solely in accordance with the Specification.

1.18    **"Sink"** means a Fully Compliant digital electronic device adapted to receive and process, from a Source or Repeater, a digital data signal representative of video and/or audio data for rendering such digital data signal to a display (in the case of video data) and/or an audio rendering system (in the case of audio data), solely in accordance with the Specification.

1.19    **"Source"** means a Fully Compliant digital electronic device adapted to process a digital signal representative of video and/or audio data and, upon processing, to transmit the processed digital data signal or sub-set of such digital data signal to a Repeater or Sink for producing a visual image and/or audio sound as represented by the processed digital data signal, solely in accordance with the Specification.

1.20    **"Specification"** means the then-current versions, subject to Section 6.3 hereof, of the document entitled High-Definition Multimedia Interface Specification v.1.x (where x is a version number specified in each Specification release), and associated HDMI Compliance Test Specification, authored and published by the Founders and Minor Updates thereto published by the Founders.

## 2.  License to Necessary Claims.

Subject to the terms and conditions of this Agreement, including without limitation, the non-assertion set forth in Section 3, the compliance provisions set forth in Section 6, and the payment of royalty fees as set forth in Section 7, Agent hereby grants to Adopter, and Adopter hereby accepts, a nonexclusive, nontransferable (except to an acquirer as set forth in Section 9.15 below), nonsublicenseable, worldwide license under the Founders' Necessary Claims solely to make (including design and develop), have made (including have designed and have developed), use, import, and directly and indirectly, offer to sell, sell, lease, promote and otherwise distribute Licensed Products; provided that such license shall not extend to any part or function of a product in which a Licensed Product is incorporated that is not itself a Licensed Product.  Adopter understands and agrees that it has no license to patent claims other than Founders' Necessary Claims.

## 3.  Non-Assertion.  Subject to the terms and conditions of this Agreement, Adopter and its Affiliates hereby agree not to bring, commence, maintain or prosecute any action or other proceeding based on any Necessary Claims that they may now or in the future own or control, or to otherwise assert any such Necessary Claims, worldwide, against any Founder or any Fellow Adopter, solely to enable Founders and Fellow Adopters to make (including design and develop), have made (including have designed and have developed), use, import, and directly and indirectly, offer to sell, sell, lease, promote and otherwise distribute Licensed Products;

**HDMI SPECIFICATION**
**ADOPTER AGREEMENT**

provided that such non-assertion agreement shall not extend to any part or function of a product in which a Licensed Product is incorporated that is not itself a Licensed Product.

**4. Specification.** Subject to the terms and conditions of this Agreement, including without limitation, the compliance provisions set forth in Section 6, the payment of royalty fees as set forth in Section 7, and the confidentiality provisions of Section 8, Agent hereby grants to Adopter, and Adopter hereby accepts, a nonexclusive, nontransferable (except to an acquirer as set forth in Section 9.15 below), nonsublicenseable, worldwide license to use the Specification solely to make (including design and develop), have made (including have designed and have developed), use, import, and directly and indirectly, offer to sell, sell, lease, promote and otherwise distribute Licensed Products. Adopter shall not use the Specification except as expressly set forth in this Agreement.

**5. Trademarks.** The Founders have created and adopted trademark(s) and logos (collectively the "Adopted Trademarks") and trademark and logo usage guidelines (the "Trademark and Logo Usage Guidelines") for the Specification and Licensed Products as set forth in Attachment A, as may be modified from time to time by the Founders. Subject to the terms and conditions of this Agreement, including without limitation, the compliance provisions set forth in Section 6, the payment of royalty fees as set forth in Section 7, and compliance with the Trademark and Logo Usage Guidelines then in effect, Agent hereby grants to Adopter, and Adopter hereby accepts, a nonexclusive, nontransferable (except to an acquirer as set forth in Section 9.15 below), worldwide license to use the Adopted Trademarks in connection with the promotion of the Specification and the High-Definition Multimedia Interfaces and the sale, lease, promotion and distribution of Licensed Products. Such license shall be sublicenseable solely to distributors and resellers of Licensed Products produced by, or on behalf of, such Adopter, solely for use in connection with the sale and promotion of such Licensed Products, and further provided that such distributors and resellers comply with the Trademark and Logo Usage Guidelines then in effect. All goodwill associated with the use of the Adopted Trademarks shall accrue to the Agent. Adopter shall not use the Adopted Trademarks except to refer to the Specification, HDMI and Licensed Products, and shall at all times comply with the Trademark and Logo Usage Guidelines then in effect.

**6. Compliance Specification and Testing Procedure.**

6.1     Compliance Test Specification.  In order to foster interoperability among products from multiple vendors, the Founders shall jointly develop the HDMI Compliance Test Specification, as may be updated from time to time in writing by the Founders. The HDMI Compliance Test Specification represents the minimum compliance testing required for Licensed Products. Each Adopter is solely responsible for ensuring that its products comply with the High-Definition Multimedia Interfaces and interoperate with other products.

6.2     Testing Requirement.  Prior to mass producing or distributing, or permitting any such mass production or distribution, of a product (whether a chip, subsystem, or end-user product), or component thereof, that claims conformance to the High-Definition Multimedia Interfaces or that bears any Adopted Trademarks, the Adopter shall reasonably test a representative sample of such product to establish compliance with the High-Definition Multimedia Interfaces. At a minimum, this testing shall include successfully performing all testing required by the HDMI Compliance Test Specification. In addition, for the first Adopter product of each of the following Licensed Product types:  first Adopter Source product, first Adopter Sink product, first Adopter Repeater product, and first Adopter Cable Product, Adopter must successfully perform the test procedures specified in the HDMI Compliance Test Specification on a representative sample of such Licensed Product at an Authorized Testing Center.  Use of the HDMI Compliance Test

**HDMI SPECIFICATION**
**ADOPTER AGREEMENT**

Specification does not guarantee that any product will conform to the High-Definition Multimedia Interfaces, function correctly or interoperate with any other product. It is Adopter's sole responsibility to establish its own testing specifications, guides and reference designs to establish conformance with the High-Definition Multimedia Interfaces, correct functionality and interoperability. Adopter shall be solely responsible for all testing results. Each Adopter shall provide to the Agent a declaration certifying compliance with the terms of this Section 6.2 together with a copy of its test results in a form reasonably designated by Agent. Adopter shall be solely responsible for its expenses associated with such compliance testing. Upon any Founder's request, Adopter shall provide Agent with a sample of any product(s) purported to be a Licensed Product(s) for independent compliance testing, and Agent shall ask an Authorized Testing Center to conduct compliance testing on such product(s) based on the HDMI Compliance Test Specification. Adopter shall reasonably co-operate in all such testing. If the Authorized Test Center determines, in its reasonable discretion, that such product(s) do not in fact comply with the High-Definition Multimedia Interfaces, then Agent may require that Adopter promptly cease use of the Adopted Trademarks until such time as an Authorized Testing Center certifies that such product(s) do in fact comply with the High-Definition Multimedia Interfaces. Failure to provide such samples, reasonably cooperate in such testing, to make commercially reasonable efforts to cause such product to pass such compliance testing, or to promptly cease the use of the Adopted Marks when requested shall be a material breach of this Agreement.

6.3     Compliance with Specification Updates. Adopter shall comply with all Minor Updates to the Specification as follows: for Minor Updates that do not require material modifications to product designs or manufacturing processes, compliance must occur within ninety (90) days after written notice to Adopter specifying such Minor Update, and for all other Minor Updates, compliance must occur within eighteen (18) months after written notice to Adopter specifying such Minor Update.

## 7. Fees and Royalty Payments.

7.1     Annual Fees and Royalties. Adopter shall pay to the Agent the annual fees and royalties set forth in Attachment B.

7.2     Payment Timing and Method. Royalties shall be paid quarterly, within sixty (60) days after the end of each calendar quarter. Fees and royalties shall be paid via wire transfer in lawful money of the United States of America to the bank and account designated below, accompanied by a fax or e-mail transmittal of the reports below.

Payments shall be made via wire transfer to the following bank account:

| | |
|---|---|
| Bank Name: | Wells Fargo Bank |
| Bank Address: | 400 Hamilton Ave |
| | Palo Alto, Ca 94301 USA |
| | |
| Bank routing# or ABA#: | 121000248 |
| Swift #: | WFBIUS6S |
| Bank account #: | 4121234819 |
| Bank account name: | HDMI Licensing, LLC |

Reports should be faxed or e-mailed as follows:

**HDMI SPECIFICATION**
**ADOPTER AGREEMENT**

e-mail: admin@hdmi.org
fax: +1 (408) 616-4199

7.3     Records, Reports, and Audit Rights.

7.3.1   Adopter's Records.  Adopter will maintain accurate and detailed books and records sufficient to ascertain the royalties payable hereunder.  Such books and records shall be maintained for three (3) years from the end of each period when such royalties are payable.

7.3.2   Reports.  Within thirty (30) days after the close of each calendar quarter, Adopter will deliver to the Agent a report showing Adopter's total amount of royalties due, together with reasonable supporting data as may be requested by Agent showing breakdowns by product type.

7.3.3   Audit.  Not more than once per year, an independent certified public accountant selected by Agent may, upon prior written reasonable notice and during normal business hours, inspect and audit the records of Adopter on which such reports are based to determine whether the fees and royalties have been properly paid.  Adopter shall reasonably cooperate with such independent accountant.  Agent shall pay for the fees of such independent accountant.  In the event that the fees and royalties have been underpaid, and the amount of the underpayment is greater than ten percent (10%) of the amount actually due for the period being audited, Adopter shall, in addition to paying the underpaid amounts, also pay for the cost of the audit.

7.3.4   Confidentiality.  The Agent shall treat as confidential information of the Adopter the royalty reports and any information gained as the result of any audit of Adopter, and shall not utilize such information except for the purposes of ensuring compliance with this Agreement.  The Agent shall establish an internal firewall such that Agent accounting personnel shall have sole access to competitively sensitive information, such as the sales volume of competing products.  Such accounting personnel shall be bound by reasonable confidentiality agreements and shall be prohibited from disclosing such information to any third party (except for professionals, such as lawyers and accountants, retained in connection with the performance of Agent's duties and bound by a reasonable confidentiality agreement) or other Agent employee.

7.4     Late Payments.  Any payment required hereunder that is made late (including unpaid portions of amounts due) shall bear interest, compounded monthly, at the lesser of ten percent (10%) per annum or the highest interest rate permitted to be charged by the Agent under applicable law.  Any interest charged or paid in excess of the maximum rate permitted by applicable law shall be deemed the result of a mistake and such interest paid in excess of the maximum rate shall be promptly credited or refunded to Adopter.

7.5     Taxes.  The payments set forth in this Agreement are exclusive of any taxes and each Adopter shall be responsible for any and all taxes, such as sales, excise, value added, use, import/export and similar taxes based on payments to be made hereunder (excluding taxes paid on Agent's net income).  The Agent and Adopter shall reasonably co-operate to reduce and recover any such taxes.  The Agent shall pass on to the Adopter any tax refunds received by the Agent with respect to the Adopter's previous payment or reimbursement of applicable taxes hereunder, if any.  With respect to all royalties paid by Adopter to the Agent hereunder, Adopter may deduct from the payments such withholding taxes as imposed by its government, provided that such Adopter provides the Agent with official tax receipts certifying that such taxes have been paid.

7.6     Changes in Fees and Royalties.  Upon providing ninety (90) days written notice to the Adopter, and not more than once yearly, the Agent may increase or decrease the annual fee

**HDMI SPECIFICATION**
**ADOPTER AGREEMENT**

and royalty rates. Any such increase shall not exceed the change in the United States Department of Labor Producer Price Index for the previous twelve (12) months.

**8. Confidentiality.** Adopter will maintain the Specification, including the HDMI Compliance Test Specification, and any other information designated "confidential" by the Agent or Founders (collectively the "Confidential Information") in confidence with at least the same degree of care that it uses to protect its own confidential and proprietary information, but no less than a reasonable degree of care under the circumstances. No Adopter will use, disclose or copy the Confidential Information except as necessary for its employees, contractors (under obligation of confidentiality) and Fellow Adopters with a need to know solely for the purpose of implementing a product according to the Specification. A party will not, however, be liable for the disclosure of any information which is:

    i)    Rightfully in the public domain other than by the recipient's breach of a duty;

    ii)    Rightfully received from a third party without any obligation of confidentiality;

    iii)   Rightfully known to the recipient without any limitation on use or disclosure prior to its receipt from the disclosing party;

    iv)   Independently developed by employees of the recipient without using the disclosed information;

    v)    Rightfully disclosed as required by law, and provided that the recipient provides prompt written notice to the other party of such legal requirement; or

    vi)   Rightfully disclosed with the prior written consent of the disclosing party.

The party seeking to rely on one of the immediately foregoing six (6) exceptions shall bear the burden of proof for showing that such disclosure falls under any such exception.

**9. General.**

9.1    <u>Adopter Withdrawal</u>. Adopter may withdraw at any time by providing written notice to the Agent. The effect of such withdrawal is that, subject to the terms and conditions of this Agreement, the withdrawing Adopter's non-assertion granted with respect to the Specification and Minor Updates published by the Founders more than sixty (60) days prior to the date of withdrawal, shall continue in full force and shall extend to or be extended to entities who become Adopters and their Affiliates even after such withdrawal for a period of three (3) years after the date of withdrawal. Further, subject to the terms and conditions of this Agreement, the licenses and non-assertion granted to such withdrawing Adopter and its Affiliates shall continue to apply for a period of three (3) years after the date of withdrawal with respect to the Specification and any Minor Updates published by the Founders more than sixty (60) days prior to the date of withdrawal.

9.2    <u>No Other Licenses</u>. **Except for the rights expressly provided by this Agreement, no party grants or receives, by implication, or estoppel, or otherwise, any rights under any patents, trademarks, copyrights or other intellectual property rights.**

9.3    <u>Waiver</u>. No failure of any party to exercise or enforce any of its rights under this Agreement will act as a waiver of such rights. This Agreement shall not be construed to waive

## HDMI SPECIFICATION
## ADOPTER AGREEMENT

Agent's, Adopter's, or Founders' rights under law or any other agreement except as expressly set forth in this Agreement.

9.4     No Warranty.  The Agent and Founders make NO WARRANTIES EXPRESS OR IMPLIED.  The Adopted Trademarks, Specifications, and any contributions thereto provided by the Agent or Founder(s), including without limitation the HDMI Compliance Test Specification, and the licenses granted under this Agreement, are provided "AS IS" WITH NO WARRANTIES WHATSOEVER, WHETHER EXPRESS, IMPLIED OR STATUTORY, INCLUDING, BUT NOT LIMITED TO ANY WARRANTY OF MERCHANTABILITY, NONINFRINGEMENT, FITNESS FOR ANY PARTICULAR PURPOSE, OR ANY WARRANTY OTHERWISE ARISING OUT OF ANY PROPOSAL, SPECIFICATION, GUIDE, DESIGN OR SAMPLE.  Adopter understands that the HDMI Compliance Test Specification does not guarantee that any product will conform to the High-Definition Multimedia Interfaces, function correctly or interoperate with any other product, and that it is Adopter's sole responsibility to establish its own testing specifications, guides and reference designs to establish conformance with the High-Definition Multimedia Interfaces, correct functionality and interoperability.  AGENT AND EACH FOUNDER DISCLAIMS ALL WARRANTIES, RESPONSIBILITY AND LIABILITY FOR THE CONFORMANCE OF ANY PRODUCT TO THE HIGH-DEFINITION MULTIMEDIA INTERFACES, PRODUCT FUNCTIONALITY OR PRODUCT INTEROPERABILITY.

9.5     Damages.  In no event will the Agent, Founders or Adopter be liable to each other or to any third party for any loss of profits, loss of use, incidental, consequential, indirect, or special damages arising out of, or related to, this Agreement, whether or not such party had advance notice of the possibility of such damages.

9.6     Governing Law; Venue.  This Agreement shall be construed and controlled by the laws of the State of New York applicable to agreements made and to be performed entirely in such state. Any litigation arising out of this Agreement shall take place in Santa Clara County, California, and all parties irrevocably consent to jurisdiction of the state and Federal courts there.

9.7     Not Partners.  The Adopter, Agent and Founders are independent companies and are not partners or joint venturers with each other. While the Founders may select an entity to handle certain administrative tasks for them, except as expressly set forth in this Agreement, no party is authorized to make any commitment on behalf of all or any of them.

9.8     Prior Agreements; Complete Agreement.  This Agreement sets forth the entire understanding of the parties with respect to the subject matter hereof, and supersedes all prior agreements and understandings relating hereto.  No modifications or additions to or deletions from this Agreement, or waiver of any right hereunder, shall be binding unless accepted in writing by an authorized representative of all parties.

9.9     Term.  The term of this Agreement shall commence on the Effective Date and shall continue for an initial term of ten (10) years thereafter.  The Agreement shall automatically renew for additional five (5) year terms, unless Adopter gives written notice of termination within sixty (60) days of the end of then current term.

9.10    Termination.  Adopter may be terminated by written notice in the event that Adopter: (i) materially breaches any of its obligations hereunder, which breach is not cured, or not capable of cure, within thirty (30) days after written notice is given to the Adopter specifying the breach; or (ii) repeatedly breaches any of its obligations hereunder and fails to cure and cease committing such repeated breaches within thirty (30) days after being given written notice specifying the breaches.  Such termination shall be treated as a withdrawal under Section 9.1 for the purposes of the rights and licenses granted under this Agreement.

**HDMI SPECIFICATION**
**ADOPTER AGREEMENT**

9.11    Survival. In the event of the termination or withdrawal of any Adopter, this Agreement shall survive with respect to the remaining Adopters, and shall survive with respect to the withdrawing or terminated Adopter as set forth in Section 9.1. The confidentiality provisions of Section 8 shall survive for a period of ten (10) years after any expiration or termination of, or withdrawal from, this Agreement. The export control provision of Section 9.25 shall survive after any expiration or termination of, or withdrawal from, this Agreement.

9.12    Execution in Counterparts. This Agreement may be executed in any number of counterparts, each of which when so executed and timely delivered shall be deemed an original, and such counterparts together shall constitute one instrument.

9.13    Severability. If any provision of this Agreement is found invalid or unenforceable, that provision will be enforced to the maximum extent permissible in conformance with the intent of the parties, and the other provisions of this Agreement will remain in force.

9.14    Nonexclusive Remedy. The exercise by any party of any remedy under this Agreement will be without prejudice to its other remedies under this Agreement or otherwise.

9.15    Assignment. This Agreement will bind and inure to the benefit of the acquirer of all or substantially all of an Adopter's outstanding capital stock or assets and obligations. This Agreement shall further inure to the benefit of the successor of all or substantially all of a Founder's or Fellow Adopter's outstanding capital stock or assets and obligations. Any other attempt by Adopter to assign this Agreement without such consent will be null and void. Agent may freely assign its rights and obligations under this Agreement. This Agreement will bind and inure to the benefit of the acquirer of any or all of an Adopter's Necessary Claims (and Adopter shall take reasonable steps to ensure the enforceability of this provision).

9.16    Currency. All amounts herein are stated in United States dollars and shall be paid in such currency.

9.17    English Language. The parties have required that this Agreement and all documents relating thereto be drawn up in English. Les parties ont exigé que le présent contrat et tous les documents connexes soient rédigés en anglais.

9.18    Third Party Beneficiaries. While only the Agent has executed this Agreement with Adopter, Adopter understands that all of the Founders are beneficiaries of this Agreement and any Founder is entitled to enforce its terms against Adopter. Nothing in this Agreement shall be construed to give rise to any obligation on any party hereto for the benefit of a third party other than the Founders.

9.19    Headings; Section References. Section headings in this Agreement are for convenience only and shall not affect the interpretation of any provision of this Agreement. All references to section numbers in this Agreement shall refer to sections of this Agreement unless explicitly stated otherwise.

9.20    Representation of Counsel. Each party has been represented by counsel of its choice in entering into this Agreement. This Agreement shall therefore be deemed to have been entered into at arms length, with the advice and participation of counsel, and shall be interpreted in accordance with its terms without favor to any party.

9.21    Freedom of Independent Development. Nothing in this Agreement shall prohibit or restrict Adopter from independently developing competing technologies and standards and to license its patent rights to third parties, including without limitation, to enable competing technologies and standards.

**HDMI SPECIFICATION**
**ADOPTER AGREEMENT**

9.22    Licensing Options.

9.22.1    Patent License.  Adopter executes this Agreement based on the understanding that this Agreement is offered for the convenience of Adopters and each Founder is willing to provide separate patent licenses to any Necessary Claims owned by such Founder of the same scope and nature as offered herein to any person or entity on fair, reasonable and non-discriminatory terms and conditions.  Any person or entity seeking such a separate license should contact the applicable Founder in writing.

9.22.2    Specification and Adopted Mark Licenses.  Adopter executes this Agreement with the understanding that if any person or entity desires to license the Specification and Adopted Marks without obtaining a license to Necessary Claims, the Founders are willing to provide a separate license to the Specification and, to the extent permitted by law, the Adopted Trademarks of the same scope and nature as offered herein to any person or entity under fair, reasonable and non-discriminatory terms and conditions.  Any person or entity seeking such a separate license should make a written request to the Agent.

9.23    Petitioning for Necessary Claims.  Potential Adopter understands that if any Adopter, or third party, has a reasonable, good faith, belief that it is the owner of any Necessary Claim, then such person or entity shall inform the Agent and Founders, and may petition the Agent and Founders in writing for a share of future patent royalties collected under HDMI.  The HDMI Founders shall make the final determination regarding a reasonable allocation of future royalties based on any claims determined to be Necessary Claims.

9.24    Challenges to Necessary Claims.  If Adopter and/or Adopter's Affiliate(s) challenge the validity or enforceability of any Necessary Claims in any jurisdiction in a court, patent office or any other official action, such claims shall be excluded from the Necessary Claims licensed to Adopter and its Affiliates under this Agreement, and the patent holder may seek all remedies for the infringement of such claims by Adopter and/or Adopter's Affiliate(s), including injunctive relief, without reference to this Agreement.

9.25    Notices.  All notices under this Agreement shall be sent to:

If to the Agent:

> HDMI Licensing, LLC
> 1060 E. Arques Ave., Suite 100
> Sunnyvale, CA  94085 USA

If to Adopter:

> To the contact specified on the first page of this Agreement.

9.26    Export Control.  The parties agree that no technical information, including software, furnished hereunder or any direct products thereof is intended to or will be exported, directly or indirectly, to any destination restricted or prohibited by export control regulations of the U.S.A., Japan, the Netherlands, France and or any other country and jurisdiction, as applicable, without prior written authorization from the appropriate governmental authorities.

**HDMI SPECIFICATION**
**ADOPTER AGREEMENT**

*THIS PAGE INTENTIONALLY LEFT BLANK*

## HDMI SPECIFICATION
### ADOPTER AGREEMENT

In witness of their agreement, the Adopter and Agent have executed this Agreement below:

ADOPTER

New Century optronics. co ltd
Company name

By: Xiong ginjjie
Authorized Signatory

Xiong ginjjie
Name

Vice - General Manager
Title

2019 10月22日
Date

AGENT

HDMI Licensing, LLC

By: _____
Authorized Signatory

Steve Venuti
Name

President
Title

October 29 2009
Date

HDMI SPECIFICATION
ADOPTER AGREEMENT

## Attachment A

Revised: October 28, 2008

## Adopted Trademark and Logo Usage Guidelines

These trademark and logo usage guidelines have been prepared to help you understand how to correctly use HDMI's brands, trademarks, logos and slogans (the "Adopted Trademarks"). HDMI delivers the finest quality digital video and audio transmitted over a single cable and signifies interoperability among HDMI-labeled systems. Because the Adopted Trademarks represent this recognized quality and reliability in a digital interface, and are valuable assets, it is important that the branding identity maintain the same qualities. Please review these guidelines carefully before you incorporate the Adopted Trademarks into your product or related support materials. *If you have any questions concerning your use of the Adopted Trademarks, please contact trademark@hdmi.org.*

**The Adopted Trademarks**

The Adopted Trademarks consist of the following:

1)      The "HDMI Logo": includes the following logo and underlying type. The allowable usage of this logo, and its components, is described in these Guidelines.



2)      The terms "HDMI," and "High-Definition Multimedia Interface."

3)      The x.v.Color logo and term "x.v.Color"

**Use of the Adopted Trademarks**

The Adopted Trademarks may be used only by authorized licensees who are Promoters or have entered into an Adopter Agreement with the HDMI Licensing Agent (as well as authorized distributors and resellers of such licensees pursuant to the Adopter Agreement). Unless authorized in writing, you may only use the Adopted Trademarks as set forth in these guidelines and in the Adopter Agreement. You may only use the Adopted Trademarks in connection with the promotion of the HDMI Specification and the High-Definition Multimedia Interface Specification, and on products that are Fully Compliant, as defined in the Adopter Agreement. However, prior to certifying a product as Fully Compliant you may use the Adopted Trademarks on a limited number of non-production product samples solely for promotional purposes (such as at tradeshows).

Other than dropping the underlying type (High-Definition Multimedia Interface) and ™ symbol, due to size limitations described under "Size", you may not alter the Adopted Trademarks (alteration includes outlining, rotating, skewing, stretching or reproducing the mark three-dimensionally). Except as expressly authorized herein, the logo, underlying type and ™ symbol

**HDMI SPECIFICATION**
**ADOPTER AGREEMENT**

are always used together, with the mark elements holding the exact size and position relationships as shown in this example.  Do not add a drop-shadow or texture fill to any element of the Adopted Trademarks.

## HDMI Logo Usage Revisions—Updated October, 2008

The following section regarding "HDMI Logo Usage Revisions" shall go into effect as follows:

1) As of October 28, 2008, you will use commercially reasonable efforts to comply with the HDMI Logo Usage Revisions.

2) Such commercially reasonable efforts do not require any change or recall of newly designed products that are initially shipped prior to October 28, 2009, or any related packaging, marketing and instructional materials or other related collateral.

3) All newly designed products that are initially shipped after October 28, 2009, and all related packaging, marketing and instructional materials and other related collateral, shall comply with the HDMI Logo Usage Revisions.

## HDMI Logo

Adopters are not required to use the HDMI Logo.  However, in order to encourage the use of the HDMI Logo, you will receive a discounted royalty rate under the Adopter Agreement if you reasonably incorporate the HDMI Logo on your HDMI products and related documentation and promotional materials.

## Clear Space/Safe Zone

The HDMI Logo must always be positioned alone and apart from any other text or graphics. The minimum stand-alone space around the mark is  one half of the height of the letter "I" in that usage of the HDMI Logo, and on products this may be reduced to one quarter of the height of the letter "I" in that usage of the HDMI Logo.

## Colors

Acceptable colors for the HDMI Logo are white, black and percentages of black (that will appear as gray) that are in high contrast to the background.  The logo may also be reversed, where the logo is the color of the background material and the surrounding rectangle can be any of the colors listed above. When used as labeling on an HDMI-compliant device, the HDMI Logo may be printed/silk-screened in metallic silver (the specified silver is Pantone metallic color 8420) or in the specific color in which all other third party or standards-based marks are printed on the device.

## HDMI SPECIFICATION
## ADOPTER AGREEMENT

**Size**

When applied to a product, the HDMI Logo must not be less prominent than other 3rd-party technology marks or logos appearing on the product. The HDMI Logo must be 3mm tall or larger, except in the case of physical buttons and switches on products, as well as cables and connectors and hand-held portable devices, where the logo may be scaled as small as 1.5mm tall.

When smaller than 10mm tall, or when applied to a brown corrugated packaging and less than 30mm tall, the underlying type ("High-Definition Multimedia Interface") and ™ symbol may be dropped, as smaller sizes can cause the type to "fall apart".

When using the full mark, the type should never be scaled independently of the HDMI Logo, both the logo and underlying type should always be scaled together.

**Placement Guidelines**

The following are specific placement guidelines:

*Hardware*
The HDMI Logo should be placed on the front, top, rear or side surfaces of an HDMI-compliant product (i.e. television, set-top box, DVD player, projector, computer, or monitor) or on the top of a cable connector. Do not place the mark on the bottom, of the product or on any peripheral components without an HDMI connector.

In addition, the HDMI Logo may be placed on HDMI-compliant connectors and cables. The HDMI Logo should never be obstructed by another label or sticker. The HDMI Logo preferably should be printed directly onto the product using conventional methods such as silk-screening or pad printing or molded in  but, may be placed on the product using a label or sticker, along with other third-party logos. In addition, the HDMI Logo may also be used on display screens incorporated into the product.

*Product Packaging*
Place the HDMI Logo on the front, rear, side or top-viewing panel of your package. It should never be obstructed by another label or sticker. The HDMI Logo can be printed directly onto packaging or placed securely on the package using a label or sticker.

In all cases, the HDMI logo should be displayed equally and fairly and be placed with other third-party logos.

**HDMI SPECIFICATION**
**ADOPTER AGREEMENT**

*Product Packaging—Brown Corrugated Materials*
Brown corrugated packaging (typically on shipping boxes) poses a special challenge to
maintaining the integrity of the HDMI logo. This particular material causes color shift in printing,
and absorbs and spreads ink more than other print materials, thus, potentially compromising the
readability and brand equity of the HDMI logo.

It is recommended that when printing on brown corrugated material, one of the following options
be used:

1) Use Pantone® black ink
2) Apply a second coat of black ink (often referred to as "double bumping")
3) Consider using a reversed HDMI logo in a rectangular box (often referred to as "knock
   out")

In cases of printing in one color (other than Pantone® black), it is recommended that the
reversed ("knock out") HDMI logo be used.

In all cases, the HDMI logo should be displayed equally and fairly and be placed with other
third-party logos.

*Web Pages*
The HDMI Logo may be used on Web pages next to Fully Compliant products, as set forth in
the Adopter Agreement. On launch buttons, the minimum mark size is .66" or 200 pixels wide
(launch buttons on mobile devices may be scaled appropriately).

*Advertisement, Direct Mail, Collateral, In Store POP and Documentation*
The HDMI Logo may be used in any advertising, direct mail, collateral, or documentation for
Fully Compliant products. For all printed materials, we recommend the use of EPS log files.
EPS files can be reproduced at any size without compromising quality.

For one color newspaper advertisements, use the black or reversed ("knock out") of the logo
artwork. Full color advertisements may use either one color, reverse or gray version of the logo,
choosing the logo that works best with the design of the ad.

Where you are not restricted by color, the gray logo can be used for print material situations. In
situations where color is restricted, use the black, or if appropriate, reversed ("knock out")
versions of the logo.

**Where Not to Use the Adopted Trademarks**

**No Use in Your Company Name.** The Adopted Trademarks, or any potentially
confusing variation, may never be incorporated as part of the name of your company.

**No Use in Your Domain Name.** The Adopted Trademarks, or any potentially
confusing variation, may never be incorporated as part of your domain name (or any other
domain that you own or control).

## HDMI SPECIFICATION
## ADOPTER AGREEMENT

**No Use in the Name of Your Products or Services.**   The Adopted Trademarks, or any potentially confusing variation, may never be incorporated as part of the name of a product or service of your company.

**No Use with Any Product that is not Fully Compliant.**   The Adopted Trademarks may not appear on or in connection with any product that is not Fully Compliant, as set forth in the HDMI Adopter Agreement.

**No "Negative" Use.**   The Adopted Trademarks may not appear on any materials that disparage any HDMI Founder, Founder product, or Adopted Trademark, that may damage the goodwill associated with the Adopted Trademarks, or uses the Adopted Trademarks in a way that suggests a common, descriptive, or generic meaning, makes puns out of them or portrays them in a negative light, that infringe upon any HDMI Founder's intellectual property or other rights, or that violate any state or federal law or regulation, or law or regulation of any country or jurisdiction internationally.

### Referencing HDMI in Text

In text you may refer to the fact that your product incorporates HDMI technology by using phrases such as "incorporates HDMI™ technology" or "incorporates High-Definition Multimedia Interface technology." On all such materials, your company, or product, or service name must appear more prominently than that of the HDMI mark and should be visually distinguished from the HDMI mark by putting it in a different font or color or on a different line. This is important to avoid any implication that your product is manufactured, supported, or endorsed by the HDMI Licensing Agent or any of the HDMI Founders.

Some usage examples follow:

Do say: "XYZ incorporates HDMI™ technology" or "XYZ incorporates High-Definition Multimedia Interface (HDMI™) technology"

Do *not* say: "XYZ HDMI™ product" or "XYZ High-Definition Multimedia Interface (HDMI™) Product"

Do not say: "Wireless HDMI™"

### Use Proper Trademark Notice

Include the following notice on all marketing materials, such as brochures, manuals, advertising, product fliers…:

"HDMI, the HDMI Logo and High-Definition Multimedia Interface are trademarks or registered trademarks of HDMI Licensing LLC."

**HDMI SPECIFICATION**
**ADOPTER AGREEMENT**

**HDMI Feature Requirements**

The following two sections regarding "Referencing HDMI Versions and Functionality" and "HDMI Features and Minimum Required Functionality" (collectively "HDMI Feature Requirements") shall go into effect as follows:

1) As of October 17, 2007, you will use commercially reasonable efforts to comply with the HDMI Feature Requirements.

2) Such commercially reasonable efforts do not require any change or recall of newly designed products that are initially shipped prior to October 17, 2008, or any related packaging, marketing and instructional materials or other related collateral.

3) All newly designed products that are initially shipped after October 17, 2008, and all related packaging, marketing and instructional materials and other related collateral, shall comply with the HDMI Feature Requirements.

A device may only claim to support the following specific HDMI-enabled functionality if it meets the following requirements (as well as any requirements set forth in the HDMI Specification and Compliance Test Specification).

**Referencing HDMI Versions and Functionality**

HDMI versions (1.0, 1.1, 1.2, 1.2a, 1.3, etc.) are used to identify revisions to the HDMI specification only. Since each version of HDMI provides a set of capabilities and not a set of required functionality, you may not use versions by themselves to define your product capabilities or the functionality of the HDMI interface.

For example, you may not say that your product is 1.X compliant, or that your product has 1.X features or capabilities, without specifically listing all of the 1.X functionality that the product supports. Without indicating an HDMI version number, you may say that a product supports a particular feature, such as Deep Color, DVD Audio, or any of the features supported by the HDMI implementation contained within your product.

Some Deep Color usage examples follow:
You may say about a particular product's capabilities:

- Deep Color
- Supports Deep Color
- Supports Deep Color over HDMI$^{TM}$
- HDMI$^{TM}$ (V.1.3 with Deep Color )
- HDMI$^{TM}$ (Deep Color )
- HDMI$^{TM}$ (V.1.3 with Deep Color, x.v.Color$^{TM}$ , <list other supported options here> )
- HDMI$^{TM}$ (Deep Color, x.v.Color$^{TM}$, <list other supported options here> )

**HDMI SPECIFICATION**
**ADOPTER AGREEMENT**

You *MAY NOT* use the version number in product descriptions without specifically listing the version functionality that the product supports. For example, the following are *not* allowed:

- HDMI™ 1.3
- HDMI™ 1.3 compliant
- Supports HDMI™ 1.3
- Supports HDMI™ 1.3 features
- Supports HDMI™ 1.3 features, such as Deep Color, etc.
- Supports HDMI 1.3 features such as Super Color.

If you use a version number to describe your HDMI implementation, you shall clearly and explicitly identify all features of that HDMI version supported by your implementation, solely as such features are named and specified below (x.v.Color, Deep Color, Dolby True HD, <list other supported options here>). Manufacturers may not use their own brand names to describe such functionality in connection with the HDMI Adopted Trademarks.

**HDMI Features and Minimum Required Functionality**

**1.    Deep Color Functionality**

- Source: transmits a Deep Color signal (defined as a data stream having a color bit depth of greater than eight bits per color component in the 4:4:4 RGB or 4:4:4 YCbCr or 4:2:2 YCbCr color format, where at least 10 bits are meaningfully derived, without the use of dummy bits). All Deep Color source devices must support a clock speed of at least 111MHz for 4:4:4 color format, or 74.25MHz for 4:2:2 color format (equivalent to a minimum of 1080i/60Hz at 12 bit color depth or 720p/60Hz 12 bit color depth).

- Sink (display device): capable of accepting a Deep Color signal, processing such signal such that the resulting stream is greater than 8 bit color depth (in the 4:4:4 RGB or 4:4:4 YCbCr or 4:2:2 YCbCr formats) upon delivery to the display, and having a display that renders color bit depth of greater than 8 bits per color.   All sink devices that claim to implement Deep Color must support Deep Color for all supported CEA 861 timing resolutions in the device, except where the timing exceeds the capabilities of the sink device (e.g. exceeds the clock Max_TMDS_Clock indication speed in the sink device EDID). However, all Deep Color sink devices must support a Max TMDS clock of at least 111MHz for 4:4:4 color format or 74.25MHz for 4:2:2 color format (equivalent to a minimum of 1080i/60Hz at 12 bit color depth or 720p/60Hz 12 bit color depth).

- Repeater: can pass a Deep Color signal from a Deep Color source to a Deep Color sink. All repeater devices that claim to implement Deep Color must support Deep Color for all supported CEA 861 timing resolutions in the device, except where the timing exceeds the capabilities of the immediately downstream device (e.g. exceeds the clock Max_TMDS_Clock indication speed in the downstream device EDID).

- "Deep Color" may be described in local characters (e.g. "ディープカラー" in Japanese).  "Deep Color" may also be spelled as "Deep Colour" in accordance with local usage.

**HDMI SPECIFICATION**
**ADOPTER AGREEMENT**

- If one or more devices (e.g. receiver, display) are sold together as a system, and such system meets the requirements for bearing the Deep Color designation, then such devices may bear the Deep Color designation when sold together as part of such system.

**2.      Extended Color Gamut (x.v.Color™)**

- Device complies with the Name and Logo Guideline for "x.v.Color" v.2.1 (attached as Exhibit 1 below) and the HDMI "x.v.Color" Logo Technical Usage Guidelines for "x.v.Color" v.2.1H (available on the HDMI Adopter Extranet). HDMI Licensing, LLC may provide notice of updated versions from time to time.

- You may not use the term "xvYCC" (or variants thereof) as a brand or description for HDMI xvYCC-enabled functionality, provided that you may use such term in technical documentation to refer to the xvYCC standard and technology.

**3.      Audio**

- Products are encouraged to list the significant audio functions and format(s) supported.

- For example, we recommend the following to be listed if they are supported:

  SACD (SA-CD)
  DVD-Audio
  DTS-HD Master Audio
  Dolby TrueHD

- It is optional to mention the supported audio format(s), for example:

  PCM (2/5/7*-channel – indicate whether multichannel and how many channels are supported)
  AC-3
  E-AC-3
  MPEG1-layerI
  MPEG1-layerII
  MP3
  MPEG2
  AAC LC
  HE-AAC
  HE-AAC v2
  DST (as used in SACD)
  DSD (as used in SACD)
  DTS
  DTS-HD
  ATRAC
  WMA pro
  MLP (as used in DVD-Audio)

**HDMI SPECIFICATION**
**ADOPTER AGREEMENT**

### 4.    Connectors

Type A connectors should be described as the "HDMI™ Connector".

Type C connectors should be described as the "HDMI™ Mini Connector". The following are approved for communicating connector type:

- HDMI™ input / HDMI™ output – refers to a Type A connector
- HDMI™ input (Mini) / HDMI™ output (Mini ) or "HDMI™ Mini Connector" – refers to a Type C connector
- Please note that " Mini" may be described in local characters ( e.g. "ミニ" Japanese)

When further detail is required, the following are approved:

- HDMI™ Connector
- HDMI™ Mini Connector

### 5.    Cables

Cables are categorized based on the performance capabilities and compliance testing of the cable. There are two categories of cable:

- Category 1: tested to carry a 74.25MHz (standard HD) signal
- Category 2: tested to carry up to a 340MHz signal

We recommend that Category 1 cables be marked as:

"Standard HDMI™ Cable"

We recommend that the following description be used to describe the qualities of a standard cable:

Standard HDMI™ cables are tested to carry a standard HD 720p or 1080i signal. You will need a High Speed HDMI™ Cable if:
- your home theater/television is capable of increased resolution (1080p at 60 Hz refresh rate or higher)
- your home theater/television supports resolutions greater than 1080p
- your home theater/television supports Deep Color for resolutions of 720p, 1080i and higher.

Category 2 cables should be marked as:

"High Speed HDMI™ Cable"

The following description should be used to describe the qualities of a High Speed cable:

High Speed HDMI™ Cables are tested to carry an HD signal up to 1080p and higher. Use a High Speed Cable also for 720p/1080i signals that are capable of increased

## HDMI SPECIFICATION
## ADOPTER AGREEMENT

refresh rates (above 60Hz) or Deep Color. High Speed HDMI™ Cables will also support applications that only require a Standard HDMI™ Cable.

All cables should reasonably indicate on both the cable itself (on the cable and/or the cable over mold) and on the front of cable packaging, whether it is a High Speed HDMI™ Cable. High Speed cables and front packaging should include the "HDMI" mark followed by the designation "High Speed" in equivalent size and font. The spacing and other usage requirements applicable to the Adopted Trademarks and HDMI Logo shall apply to all such usages.

**6.     Lip Sync**

Later versions of this document will include rules for devices supporting automatic Lip Sync compensation.

**Other Terms and Conditions**

Your license to use any of the Adopted Trademarks will terminate no later than the termination or expiration date of the Adopter Agreement with which you obtained the right to use the Adopted Trademarks. Notwithstanding any other termination provision, however, HDMI Licensing, LLC reserves the right at any time in its sole discretion to terminate or modify the permission granted herein to use any of the Adopted Trademarks. For example, HDMI Licensing, LLC may require that you immediately stop use of an Adopted Trademark if you do not use the mark in accordance with these Guidelines or if your use may violate intellectual property or trademark laws of any particular country or jurisdiction.

Nothing herein is intended to grant you any right in any of the Adopted Trademarks other than the right to use the marks in accordance with the requirements set forth herein. HDMI Licensing, LLC reserves the right to take action against any use that does not conform to these requirements, that infringes on any intellectual property or other right, or that violates other applicable laws. However, nothing in these guidelines obligates HDMI Licensing, LLC or the HDMI Founders to object to such adverse use.

HDMI LICENSING, LLC AND ALL HDMI FOUNDERS DISCLAIM ANY AND ALL WARRANTIES WHETHER EXPRESS OR IMPLIED BY LAW REGARDING THE USE OF THE ADOPTED TRADEMARKS INCLUDING WITHOUT LIMITATION WARRANTIES AGAINST INFRINGEMENT.

**HDMI SPECIFICATION**
**ADOPTER AGREEMENT**

THIS PAGE IS INTENTIONALLY BLANK.

APPENDIX x.v. Color Usage Guideline follows this page.

**HDMI SPECIFICATION**
**ADOPTER AGREEMENT**

EXHIBIT 1

## Name & Logo Guideline



This guideline is for "x.v.Color," ☑**x.v.Color** as well as

"x.v.Colour." ☑**x.v.Colour**

Ver.2.1 September 2007
Published by
Standard & Partnership Dept.
Sony Corporation

**HDMI SPECIFICATION**
**ADOPTER AGREEMENT**

## Document Revision History

| | | |
|---|---|---|
| Ver2.2 | August 2008 | Revised Description of Logo Size<br>Revised use of logo on Product Packaging<br>Several minor editorial. (throughout) |
| Ver2.1 | September 2007 | Revised Trademark notice required.(4)<br>Several minor editorial. (throughout) |
| Ver2.0 | May 2007 | Added explanation of "x.v.Color".(5-4)<br>Added usage of logo for "x.v.Color"<br>demonstration software.(5-5) |
| Ver1.0 | March 2007 | Initial release. |

**HDMI SPECIFICATION
ADOPTER AGREEMENT**

## Contents

1. About Guideline
    1-1 Objective of "x.v.Color" Guideline
    1-2 Revision and invalidation of Guideline
    1-3 Contact

2. "x.v.Color" Brand Name & Logo
    2-1 Permitted uses of the "x.v.Color" logo
    2-2 Territory of usage of the "x.v.Color" logo

3. Display of the "x.v.Color" logo
    3-1 Correct form and reproduction
    3-2 Size specification and minimum size
    3-3 Logo color
    3-4 Background colors
    3-5 Isolation zone
    3-6 To be used independently, not combined with other elements

4. Trademark Notice

5. Usage of "x.v.Color" Brand Name & Logo
    5-1 Placement of "x.v.Color" logo
    5-2 "x.v.Color" logo in motion picture
    5-3 Caution to use "x.v.Color" brand name & logo
    5-4 Explanation of "x.v.Color"
    5-5 Usage of "x.v.Color" logo for demonstration software

6. Other Important Information
    6-1 Usage of "x.v.Color" and "x.v.Colour"
    6-2 Correspondence with local language

**HDMI SPECIFICATION**
**ADOPTER AGREEMENT**

## 1. About Guideline

### 1-1 Objective of "x.v.Color" Guideline

This document stipulates the correct usage of the "x.v.Color" logo to help build a consistent visual identity of the logo.

### 1-2 Revision and invalidation of Guideline

Sony Corporation may revise and/or invalidate this guideline, and will inform adopters of the "x.v.Color" and "x.v.Color" logo when doing so.

### 1-3 Contact

Standard & Partnership Dept.
Sony Corporation

**HDMI SPECIFICATION**
**ADOPTER AGREEMENT**

## 2. "x.v.Color" Brand Name & Logo

### 2-1 Permitted uses of the "x.v.Color" logo

The "x.v.Color" logo may be used on products conforming to the <"x.v.Color" Technical Guideline> provided separately, on packaging and wrapping materials, instruction manuals, marketing materials (catalogs, posters and other printed media, as well as video media such as TV commercials, websites, etc.), in promotional materials (POP displays, display stands, etc.), and at events.

### 2-2 Territory of usage of the "x.v.Color" logo

The "x.v.Color" logo may be used worldwide as a trademark, except in those countries where usage of the "x.v.Color" logo is prohibited by law.

## 3. Display of the "x.v.Color" logo

### 3-1 Correct form and reproduction

When reproducing the "x.v.Color" logo, be sure to use the electronic logo data provided with the guidelines. Do not disturb the logo as this would give viewers the wrong impression.







**HDMI SPECIFICATION**
**ADOPTER AGREEMENT**



Do not stretch the logo.



Do not condense the logo.



Do not italicize the logo.



Do not reduce the letter spacing.



Do not increase the letter spacing.



Do not twist the logotype.



Do not use a screen or lines over the logotype.



Do not outline the logo.



Do not use 3-D or shadow text.



Do not set the letters in an arc.



Do not set the letters at an angle.



Do not set the individual letters vertically.



**HDMI SPECIFICATION**
**ADOPTER AGREEMENT**

### 3-2 Size specification and minimum size

•Determining the size of the "x.v.Color" logo

When determining what size of the "x.v.Color" logo to use, refer to the character height (H) as shown below.



• Minimum size of the "x.v.Color" logo:

In consideration of the logo's reproducibility, all "x.v.Color" logos must have a minimum character height (H) of 3mm. Similarly, on-screen displays of the logo as seen on the Web must have a minimum character height (H) of 10 pixels. However, if the logo cannot be reproduced accurately using the minimum sizes specified here, when displaying the logo on products, for example, use the smallest acceptable logo size that can be accurately reproduced.

 H=3mm     H=10pixels

**HDMI SPECIFICATION**
**ADOPTER AGREEMENT**

### 3-3 Logo color

The "x.v.Color" logo should always be displayed in the designated colors as shown below.



Positive display
(Black Color)

Negative display
(White Color)



In case of non full-colored printing, the logotype without the visual icon should be used.

HDMI SPECIFICATION
ADOPTER AGREEMENT

## 3-4 Background colors

The background colors are not specified, but ensure that the "x.v.Color" logo should be always displayed clearly and conspicuously. In addition, do not display the "x.v.Color" logo more than once on the same face for instance as a background pattern.





Do not display the "x.v.Color" logo against a background that reduces its clarity.



Do not use designs or patterns which weaken the impact of the "x.v.Color" logo.



Do not use the "x.v.Color" logo as a background pattern.

Do not use color combinations that reduce clarity or lack appropriate brightness, vividness, or contrast.



Do not use color combinations that reduce clarity or lack appropriate brightness, vividness, or contrast.

**HDMI SPECIFICATION**
**ADOPTER AGREEMENT**

### 3-5 Isolation zone

Leave ample surrounding space (the isolation zone) around the "x.v.Color" logo to avoid a loss of visual impact.





Do not display the "x.v.Color" logo too close to advertising copy.



**HDMI SPECIFICATION**
**ADOPTER AGREEMENT**

## 3-6 To be used independently, not combined with other elements

"x.v.Color" logo should always be positioned so that it is clear, conspicuous, and independent. Keep it away from other layout elements such as text and graphics.



Do not combine other graphic elements with "x.v.Color" logo. Do not use it in unusual ways that could cause people to perceive it as a different mark.

     

Do not combine "x.v.Color" logo with generic term, a product name, a model name etc.

     



**HDMI SPECIFICATION**
**ADOPTER AGREEMENT**

## 4. Trademark Notice

"x.v.Color" and "x.v.Color" logo are trademarks of Sony Corporation.

When using "x.v.Color" regular typeface or the "x.v.Color" logo on printed materials or websites, the trademark notice of "x.v.Color" (and the "x.v.Color" logo) shall be clearly indicated in at least one place.

Examples:

• "x.v.Color" and **x.v.Color** are trademarks of Sony Corporation.

The expression below is also available.

• "x.v.Color" **x.v.Color** and are trademarks.

**HDMI SPECIFICATION**
**ADOPTER AGREEMENT**

## 5. Usage of "x.v.Color" Brand name & Logo

### 5-1 Placement of "x.v.Color" logo

The placement of the "x.v.Color" logo will not be specified as it depends on the shape of the object, but it must be displayed properly in accordance with "3. Display of the x.v.Color logo" and "4. Trademark notice" in this guideline.

### 5-2 "x.v.Color" logo in motion picture

In case of using the "x.v.Color" logo in motion picture, it should be displayed in proper shape without rotation or deformation.

### 5-3 Caution to use "x.v.Color" brand name and logo

**5-3-1.** When using "x.v.Color" in a regular typeface, it shall be enclosed in double quotation or displayed in bold or with "TM" to prevent its being generic term, wherever it may be displayed.

Examples:

• "x.v.Color"
• x.v.Color ™
• **x.v.Color**

**5-3-2.** "x.v.Color" and "x.v.Color" logo should not be used in combination with other logo, trademark, company name and product name as well as modifiers.

Prohibited examples:

• "x.v.Color" camcorder
• Sony "x.v.Color"
• Super "x.v.Color"



**HDMI SPECIFICATION**
**ADOPTER AGREEMENT**

## 5-4 Explanation of "x.v.Color"

Do not use expressions to mislead the features and benefits of "x.v.Color".

Example of explanation:

"x.v.Color" is a promotion name given to the products that have the capability to realize a wide color space based on the xvYCC specifications and is a trademark of Sony Corporation.

## 5-5 Usage of "x.v.Color" logo for demonstration software

On software that is created and used to demonstrate "x.v.Color", the "x.v.Color " logo may be used without fully conforming to Sections 3-4 and 3-5 in "Chapter 3 - Display of the "x.v.Color" logo" in this guideline in case the logotype is used without the visual icon described in 3-3 just in order to avoid the "burn-in" phenomenon. Even under such exceptions, please maintain as much visibility of the logo as possible.

**HDMI SPECIFICATION**
**ADOPTER AGREEMENT**

## 6. Other Important Information

### 6-1 Usage of "x.v.Color" and "x.v.Colour"

2 types of names and logos - "x.v.Color" and "x.v.Colour" - are designated in this guideline. Either logo, or both can be used, according to the country or area of use.

### 6-2 Correspondence with local language

"x.v.Color" must be used universally in all regions, and must not be translated into local languages.

**HDMI SPECIFICATION**
**ADOPTER AGREEMENT**

## Attachment B

**Fees and Royalties**

<u>Fees</u>:

Upon execution of the Adopter Agreement, and upon each yearly anniversary of the effective date of each Adopter Agreement thereafter, each Adopter will pay Agent an annual fee of fifteen thousand dollars ($15,000).  Provided, however, that for those annual fees that come due after November 1, 2006, the annual fee shall be ten thousand dollars ($10,000).

<u>Alternative Fee Payment</u>.  Commencing upon the execution of the Adopter Agreement, and upon each yearly anniversary of the effective date of the Adopter Agreement, each Adopter who sells Licensed Products subject to a royalty under the Adopter Agreement may elect to not pay the fixed annual administrative fee set forth immediately above, and instead may elect to pay the administrative fee according to the following alternative formula: (i) upon execution of the Adopter Agreement, and upon each yearly anniversary of the effective date of the Adopter Agreement thereafter, such Adopter will pay Agent a fixed administrative fee of five thousand dollars ($5,000); and (ii)  Adopter will pay a variable administrative fee equal to one dollar ($1.00) per unit for each end-user Licensed Product sold by Adopter and subject to a royalty under this Adopter Agreement.  Such variable administrative fee shall be paid in quarterly installments. For clarification, Adopters will pay the royalties apart from the Administration Fee for Licensed Products as set forth in this Agreement. For the avoidance of doubt, Adopters who sell Licensed Products that are not subject to a royalty under the Adopter Agreement may not elect to pay the administrative fee under this Alternate Fee Payment provision.  Notwithstanding any other provision of this Adopter Agreement, these Alternative Fee Payment provisions may be adjusted or rescinded by the Founders in their sole discretion after October 1, 2006.

<u>Royalties</u>:

All Adopters shall pay Agent a running royalty for each end-user Licensed Product sold by such Adopter.  An end-user Licensed Product is defined as a product that is typically designed and sold for use by end-users, and where such products are not themselves incorporated into a royalty-bearing end-user Licensed Product. Examples of end-user Licensed Products include, but are not limited to, DVD players, set top boxes, Digital TVs, D-VHS players, A/V Receivers, and Personal Computers.  Examples of devices that are not end-user Licensed Products include, but are not limited to Components such as ICs and printed circuit boards (except where such Components are sold directly to end-users for assembly into systems). The applicable royalty rates shall be determined as follows:

      (i)     For each end-user Licensed Product that is sold by Adopter, the royalty is $0.15 per unit sold.  Manufacturers of Components, Cables and Connectors will pay no per unit royalty to the extent such Components, Cables and Connectors are incorporated into end-user Licensed Products subject to royalty hereunder.  Components, Cables and Connectors sold otherwise shall be considered end-user Licensed Products subject to the payment of royalties.

      (ii)    In order to encourage Adopters to make use of the Adopted Trademarks, Adopter shall pay a discounted rate of $0.05 per unit sold if Adopter reasonably

**HDMI SPECIFICATION**
**ADOPTER AGREEMENT**

incorporates the Adopted Trademarks on its Licensed Products and related documentation and promotional materials.

(iii)    In the event Adopter licenses content protection technology for HDMI as recommended in the Specification (e.g., High-bandwidth Digital Content Protection) and adds such content protection technology to the HDMI functionality of its Licensed Products in accordance with the terms of such content protection technology license agreement and the Specification, the royalty paid by Adopter shall be further reduced by $0.01 per unit of end-user Licensed Product sold.

# EXHIBIT C

DocuSign Envelope ID: 52207EA0-2A8E-4EBE-8809-4253FDCF6

HDMI Licensing Administrator, Inc.

Jessie Pan                                                                          April 30, 2018
Sales

CHUNGHSIN TECHNOLOGY GROUP CO., LTD.
No.168 Gongren West Road, JiaoJiang Area,
Taizhou, Zhejiang, 318000
CHINA

**Re:** *Final Notice of Termination for the High-Definition Multimedia Interface Specification Adopter Agreement.*

Dear Jessie,

Pursuant to Section 9.10 of the High-Definition Multimedia Interface Specification Adopter Agreement, dated October 29, 2009 between CHUNGHSIN TECHNOLOGY GROUP CO., LTD. ("CNC") and HDMI Licensing Administrator, Inc. ("HDMI LA"), this letter serves as final notice that the Adopter Agreement will terminate if CNC does not cure its breaches within 30 days of CNC's receipt of this letter.

CNC is currently in breach of the Adopter Agreement including but not limited to:

(1) Section 7.1: Failure to remit and pay for royalties due per the agreement. Specifically, royalties due per the audit performed per Section 7.3.3 of the agreement.

(2) Section 7.3.3 Audit:
Not more than once per year, an independent certified public accountant selected by Agent may, upon prior written reasonable notice and during normal business hours, inspect and audit the records of Adopter on which such reports are based to determine whether the fees and royalties have been properly paid. Adopter shall reasonably cooperate with such independent accountant. Agent shall pay for the fees of such independent accountant. In the event that the fees and royalties have been underpaid, and the amount of the underpayment is greater than ten percent (10%) of the amount actually due for the period being audited, Adopter shall, in addition to paying the underpaid amounts, also pay for the cost of the audit.

HDMI LA notified CNC on September 20, 2017 of its intent to have an independent auditor, Connor Consulting ("Connor"), the independent CPA firm engaged by HDMI LA, inspect the records of CNC for which the fee (royalty) statements are based. Connor held the kick-off call with CNC on October 19, 2017 and started the audit fieldwork at CNC on December 13, 2017. After the fieldwork, Connor kept following up with CNC regarding the additional data requested for eight times between December 18, 2017 and January 31, 2018, however, no feedback received from CNC. HDMI LA also escalated on this audit with CNC on February 13, 2018 and February 26, 2018. On March 22, 2018, Connor held a three-way call with CNC and HDMI LA to discuss the audit findings, because there were pending items that CNC believe it could provide additional evidence and data to Connor, both HDMI LA and Connor had agreed to give CNC one week to collect the additional evidence and data and provide it to Connor by March 30, 2018, but as of April 30, 2018, CNC hadn't provided such data, despite both HDMI LA and Connor had followed up multiple times. The continued delays and noncooperation show CNC's lack of respect for the audit. HDMI LA would like to remind CNC of its obligations per Section 7.1 that CNC is required remit and pay for royalties due per the audit performed and per Section 7.3.3. CNC shall reasonably cooperate with such independent accountant to complete the audit.



DocuSign Envelope ID: 52207EA0-2A8E-4EBE-8809-   4253FDCF6

HDMI LA sincerely regrets that we are left with no choice but to terminate the Adopter Agreement unless CNC cures its breaches including:

(1) Provide the additional evidence and data to the independent accountant Connor Consulting no later than May 11, 2018

(2) Cooperate with Connor Consulting for additional reasonable requests to conclude the audit by May 18, 2018

(3) Participate in a 3-way close meeting with Connor, HDMI LA, and CNC to hand the audit over to HDMI LA and CNC to negotiate on any open royalties potentially due and owing.

(4) Sign a settlement agreement for any royalties potentially due and owing no later than May 31, 2018.

CNC has 30 days to cure the breaches listed above or HDMI LA will have no other option but either terminate CNC's right to use the Adopted Trademarks in accordance with the Adopter Agreement or terminate the Adopter Agreement in full. Termination will mean that CNC is delinquent in its obligations, CNC will not be granted permission to use any of the HDMI Adopted Trademarks, be publically listed on the HDMI.org website as a terminated adopter, and HDMI LA will pursue all legal avenues to protect its intellectual property to the fullest extent.

Please feel free to email me at tbordi@hdmi.org or Edwin Wang at edwin.wang@hdmi.org if you have any further questions or concerns.

Regards,

Trudi Bordi
Vice President Licensing
HDMI Licensing Administrator, Inc.



# EXHIBIT D

HDMI Licensing Administrator, Inc.

Jessie Pan                                                                                    June 27, 2018
Sales

CHUNGHSIN TECHNOLOGY GROUP CO., LTD.
No.168 Gongren West Road, JiaoJiang Area,
Taizhou, Zhejiang, 318000
CHINA

**Re:** *Final Notice of Termination for the High-Definition Multimedia Interface Specification Adopter Agreement.*

Jessie,

On April 30, 2018 HDMI Licensing Administrator, Inc. ("HDMI LA") provided a final termination notice pursuant to Section 9.10 of the High-Definition Multimedia Interface Specification Adopter Agreement, dated October 29, 2009 between CHUNGHSIN TECHNOLOGY GROUP CO., LTD. ("CNC") and HDMI LA, CNC did not cure it's breaches within 30 day's receipt of such notice.

CNC has failed to cure all breaches per the April 30, 2018 notice and therefore, HDMI LA removed CNC from the active HDMI adopter list on May 31st, 2018. HDMI LA had meeting with CNC on June 7th and 8th at Computex in Taiwan where CNC committed to provide a settlement offer by June 15th, however no offer has been received by HDMI LA. HDMI LA in good faith has not fully terminated the Adopter Agreement in an attempt to try to work with CNC to close the audit. HDMI LA provided one last opportunity to provide an offer by June 20th, yet there has been no response by CNC.

HDMI LA therefore is giving CNC 10 days to provide a settlement offer and sign a settlement agreement with HDMI LA to close and settle the audit findings or CNC's Adopter Agreement will be terminated in full. CNC will be listed on the Terminated Adopters List and all necessary enforcement actions to protect HDMI LA's intellectual property will be taken.

If you have any further questions please contact myself at tbordi@hdmi.org or Edwin Wang at edwin.wang@hdmi.org .

Regards,

Trudi Bordi
Vice President Licensing
HDMI Licensing Administrator, Inc.



# EXHIBIT E



Epstein Drangel LLP

60 East 42nd Street, Suite 2520, New York, NY 10165

T: 212.292.5390 • E: mail@ipcounselors.com

www.ipcounselors.com

November 16, 2018

**VIA FEDERAL EXPRESS & E-MAIL**

Mr. Chen Desong
Chairman
CHUNGHSIN TECHNOLOGY GROUP CO LTD
Jiaojiang Area Taizhou City 618 Gongren West Road
Taizhou, Zhejiang 318000
China

> Re:    Infringement of HDMI LA Intellectual Property by Chunghsin Technology Group
> ("CNC")

Dear Mr. Desong:

We represent HDMI Licensing Administrator, Inc. ("HDMI LA"), the licensing agent responsible for administering the licensing of the next-generation, industry-leading and de-facto digital interface specification for connecting consumer electronics products capable of sending or receiving an HD signal (the "HDMI Specification"). As you are aware, HDMI LA is the owner of all rights in and to the "HDMI" brand, including U.S. Trademark Registration No. 3,268,924 for "HDMI" for a wide variety of goods in Class 9; U.S. Trademark Registration No. 3,442,135 for **HDMI** for a wide variety of goods in Class 9, U.S. Trademark Registration No. 2,900,587 for "HDMI" for a wide variety of goods in Class 35 and U.S. Trademark Registration No. 2,898,044 for **HDMI** for a wide variety of goods in Class 35 (hereinafter collectively referred to as the "HDMI LA IP").

HDMI LA has advised us that, at least as early as May 31, 2018, CNC was terminated as an HDMI Adopter pursuant to Paragraph 9.10 of the agreement entered into as between HDMI LA and CNC in 2009 ("Termination" and "CNC Adopter Agreement," respectively), yet CNC continues to sell unauthorized, non-compliant, counterfeit and/or infringing products utilizing the HDMI Specification and incorporating HDMI LA IP ("Unauthorized Products"). Accordingly, this letter serves as notice to CNC that its continued sales of Unauthorized Products following the Termination, and particularly in light of CNC's failure to remedy the breach of the CNC Adopter Agreement, is willful infringement/counterfeiting of the HDMI LA IP, and a blatant disregard of HDMI LA's intellectual property rights. As such, this letter shall also serve as notice that any and all Unauthorized Products are subject to removal from the marketplace through HDMI LA's normal enforcement activities.

Your continued sale of Unauthorized Products constitutes both breach of contract, trademark infringement and/or counterfeiting and unfair competition. If HDMI LA chooses to

CHUNGHSIN TECHNOLOGY GROUP CO LTD
Page 2

pursue CNC and its related companies, affiliates, factories and/or customers ("Liable Parties") for these claims in court in the U.S., where CNC has consented to jurisdiction, HDMI LA would be entitled to, among other relief: (1) seize Unauthorized Products; (2) an injunction against advertising, marketing, promotion, distribution, display, offering for sale, and/or sales of the Unauthorized Products; and (3) payment of royalties due pursuant to the CNC Adopter Agreement, plus damages to HDMI LA for sale of Unauthorized Products, i.e., treble damages or statutory damages up to $2,000,000 per infringement, and attorneys' fees. You should be aware that all parties involved in the chain of distribution of Unauthorized Products are liable to HDMI LA.

Consequently, we hereby demand that you, and your affiliate companies, partners and customers, **IMMEDIATELY CEASE AND DESIST** any and all manufacturing, importation, exportation, advertising, marketing, promotion, distribution, display, offering for sale and/or sales of the Unauthorized Products. We also demand that you do the following within **seven (7) days** of your receipt of this letter:

1. Confirm in writing that all manufacturing (domestic and foreign), importation, exportation, advertising, marketing, promotion, distribution, display, offering for sale, and/or sales of the Unauthorized Products, have ceased;
2. Surrender ALL Unauthorized Products in your possession, custody or control; and
3. Provide us with a full accounting of all monies due, pursuant to the CNC Adopter Agreement, including monies due post-Termination, **and pay all monies due**.

HDMI LA considers your conduct to constitute a serious violation of HDMI LA's rights and to be very damaging to its business and reputation. Your failure to provide a comprehensive response to this letter **NO LATER THAN SEVEN (7) DAYS FROM THE DATE OF THIS LETTER** will only assure us of your intention to continue willfully infringing on HDMI LA's rights. In such a situation, we have been instructed to take all actions necessary to enforce our client's rights to the full extent of the law. Nothing in this letter shall be construed as a waiver or relinquishment of any right or remedy possessed by HDMI LA.

Best regards,

Jason M. Drangel

cc: HDMI Licensing Administrator, Inc.

# EXHIBIT F

DocuSign Envelope ID: 789FE6FC-61A7-4852-8D72-FE2EA57C28CA

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HDMI LICENSING ADMINISTRATOR, INC.<br>*Plaintiff*<br><br>v.<br><br>CHUNGHSIN TECHNOLOGY GROUP CO., LTD. f/k/a NEW CENTURY OPTRONICS CO., LTD.<br>*Defendants* | Case No. 5:19-cv-00057-JST<br><br>Complaint Filed:      January 4, 2019 |

**MODIFICATION TO CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE DATED OCTOBER 29, 2019 (THE "SETTLEMENT AGREEMENT")**

Whereas, CHUNGHSIN TECHNOLOGY GROUP CO., LTD. f/k/a NEW CENTURY OPTRONICS CO., LTD has requested a 30-day extension of the Initial Payment pursuant Section 6(a) of the Settlement Agreement, the parties hereby consent to a further extension with the following additional consideration:

- modify Section 6(a) as follows: The Initial Payment of **$1,100,000.00 USD** and the second scheduled payment of $200,000.00 currently scheduled to be paid upon execution of the new HDMI Adopter Agreement ("New Initial Payment") shall be due by **no later than December 19, 2019** (the "New Initial Payment Date");
- modify Section 7 as follows: CNC will execute the HDMI Adopter Agreement no later than December 19, 2019 and remit payment no later than December 27, 2019.
- modify Section 10 to add the following last sentence: In the event CNC fails to make the timely payment of the New Initial Payment by the New Initial Payment Date and comply with its obligations pursuant to Paragraph 7, CNC will be entitled to a temporary restraining order ("TRO") to prevent CNC from exhibiting products using the HDMI Specification and/or HDMI Trademarks during CES Las Vegas 2020 plus an award of HDMI LA's costs and attorneys' fees in pursuing and enforcing said TRO.

The remaining terms of the Settlement Agreement, including without limitation the other payment dates, remain unchanged.

1

"HDMI LA"

HDMI Licensing Administrator, Inc.

By: _____

Name:  **Robert Tobias**

Its:  **CEO**

"CNC"

Chunghsin Technology Group
Co. Ltd. f/k/a New Century Optronics
Co., Ltd.

By: _Deputy Director_____

Name: _Reb_____

Its: _____

2

# EXHIBIT G

HDMI Licensing Administrator, Inc

Huaping Dong                                                                August 6, 2018

CHANGZHOU WUJIN BEST ELECTRONIC CABLES CO., LTD
LIJIA TOWN, WUJIN, CHANGZHOU,
JIANGSU 213167
CHINA

Re:  *Final Notice of Termination for the High-Definition Multimedia Interface Specification Adopter Agreement.*

Dear Mr. Dong,

Pursuant to Section 9.10 of the High-Definition Multimedia Interface Specification Adopter Agreement, dated November 20, 2012 between CHANGZHOU WUJIN BEST ELECTRONIC CABLES CO., LTD. ("WUJIN BEST") and HDMI Licensing Administrator, Inc. ("HDMI LA"), this letter serves as final notice that the Adopter Agreement will terminate if WUJIN BEST does not cure its breaches within 30 days of WUJIN BEST's receipt of this letter.

WUJIN BEST is currently in breach of the Adopter Agreement including but not limited to:

> Section 7.3.1 Adopter's Records:
> Adopter will maintain accurate and detailed books and records sufficient to ascertain the royalties' payable hereunder. Such books and records shall be maintained for three (3) years from the end of each period when such royalties are payable.
>
> Section 7.3.3 Audit:
> Not more than once per year, an independent certified public accountant selected by Agent may, upon prior written reasonable notice and during normal business hours, inspect and audit the records of Adopter on which such reports are based to determine whether the fees and royalties have been properly paid. Adopter shall reasonably cooperate with such independent accountant. Agent shall pay for the fees of such independent accountant. In the event that the fees and royalties have been underpaid, and the amount of the underpayment is greater than ten percent (10%) of the amount actually due for the period being audited, Adopter shall, in addition to paying the underpaid amounts, also pay for the cost of the audit.

HDMI LA notified WUJIN BEST on July 3, 2018 of its intent to have an independent CPA firm, Connor Consulting ("Connor"), inspect the records of WUJIN BEST for which the fee (royalty) statements are based. Connor, HDMI LA and WUJIN BEST had kickoff call on July 13, 2018 when WUJIN BEST claimed no books and records for the past three (3) years can be provided for the audit, only one (1) year of books and records are available. HDMI LA would like to remind WUJIN BEST of its obligations per Section 7.3.1 and Section 7.3.3 that WUJIN BEST is required to maintain complete books and records to ascertain the royalties reported and paid. Connor is unable to complete their audit due to lack of such data as required by the audit. WUJIN BEST is in breach for not maintaining such books and records.

HDMI LA sincerely regrets that we are left with no choice but to terminate the Adopter Agreement unless WUJIN BEST cures its breaches including:

> (1) Provide the requested HDMI sales data to the independent accountant Connor Consulting no later than August 20, 2018;
> (2) Cooperate with Connor Consulting for fieldwork by September 6, 2018;



(3) Participate in a 3-way close meeting with Connor, HDMI LA, and WUJIN BEST to hand the audit over to HDMI LA and WUJIN BEST to negotiate on any open royalties potentially due and owing;

(4) Sign a settlement agreement for any royalties potentially due and owing no later than October 30, 2018.

WUJIN BEST has 30 days to cure the breaches listed above or HDMI LA will have no other option but either terminate WUJIN BEST's right to use the Adopted Trademarks in accordance with the Adopter Agreement or terminate the Adopter Agreement in full. Termination will mean that WUJIN BEST is delinquent in its obligations, WUJIN BEST will not be granted permission to use any of the HDMI Adopted Trademarks, be publically listed on the HDMI.org website as a terminated adopter, and HDMI LA will pursue all legal avenues to protect its intellectual property to the fullest extent.

Please feel free to email me at swang@hdmi.org or Edwin Wang at edwin.wang@hdmi.org if you have any further questions or concerns.

Regards,

Serena Wang
Royalty & Audit Manager
HDMI Licensing Administrator, Inc.



# EXHIBIT H

**From:** Serena Wang <swang@hdmi.org>
**Sent:** Monday, October 21, 2019 2:29 PM
**To:** Stefanie Jiang; fERkCZ
**Cc:** Gwen Sun; Maggie Wang; Bernard Lau
**Subject:** RE: Re:CHANGZHOU WUJIN BEST ELECTRONIC CABLES CO LTD -- Statement from HDMI LA
**Attachments:** WUJIN BEST Termination Notice 8 6 2018 Signed.pdf

Hi Mr. Dong,

Please note your HDMI license was terminated on 10/10/2019 due to the reasons listed in attached termination notice. Also since you claimed WUJIN BEST has declared bankruptcy in 2014, it shouldn't be our adopter anyway. WUJIN Best's failure to maintain 3 years' of records and failure to perform the audit are the main reasons for termination. In addition, Jiangsu BEST has been operating under WUJIN BEST's license with no Affiliate relationship with WUJIN BEST is also a breach of the Adopter Agreement as HDMI license is nontransferable and non-sublicenseable.

WUJIN BEST should cease manufacturing or selling any HDMI products effective immediately from 10/10/2019.

If you have any questions, please feel free to contact me directly.

Thanks,

Serena Wang
Sr. Royalty & Audit Manager
HDMI Licensing Administrator, Inc. (HDMI LA)
Address: 550 S. Winchester Blvd. Suite 515, San Jose, CA 95128
Office: +1 408-861-4895  Mobile: +1 908-787-6800

 **HDMI 2.1 Specification**

A Huge Leap Forward

*The terms HDMI, HDMI High-Definition Multimedia Interface, and the HDMI Logo are trademarks or registered trademarks of HDMI Licensing Administrator, Inc.*

**From:** Stefanie Jiang <sjiang@hdmi.org>
**Sent:** Sunday, October 20, 2019 8:47 PM
**To:** fERkCZ <dong-hua-ping@163.com>
**Cc:** Serena Wang <swang@hdmi.org>; Gwen Sun <wsun@hdmi.org>; Maggie Wang <maggie.wang@hdmi.org>; Bernard Lau <blau@hdmi.org>
**Subject:** 答复: Re:CHANGZHOU WUJIN BEST ELECTRONIC CABLES CO LTD — Statement from HDMI LA

Hi Mr. Dong,

Please note the HDMI license for CHANGZHOU WUJIN BEST has been terminated due to some audit issues. If you have question, please contact our audit manger Serena in CC.

(Please check that this adopter is not already in the database first by typing in the first part of their company name a

| Adopter | Website | Status |
|---|---|---|
| CHANGZHOU WUJIN BEST ELECTRONIC CABLES CO., LTD (江苏贝斯特电器有限公司) | www.bstcable.com | Terminate |

Regards,

Stefanie Jiang ▪ HDMI accounting ▪ HDMI Licensing Administrator, Inc.
Email: SJIANG@HDMI.ORG | Shanghai, China | MB: (86) 138 169 72529

**发件人:** fERkCZ <dong-hua-ping@163.com>
**发送时间:** Friday, October 18, 2019 10:25 AM
**收件人:** Stefanie Jiang <sjiang@hdmi.org>
**主题:** Re:CHANGZHOU WUJIN BEST ELECTRONIC CABLES CO LTD -- Statement from HDMI LA

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Dear stefanie:
    Sorry for delay payment.
    I just rushed our finances, our bank got off work at 15:00 on the weekend of the weekend,
and next Monday is October 21 to arrange the full payment.
    Thank you,
Mr.Dong

At 2019-10-04 16:23:50, "Stefanie Jiang" <sjiang@hdmi.org> wrote:

Dear Dong-Hua,

Please see attached statement of outstanding invoices under your account with HDMI LA.

Our records indicate 2 invoices are open as of today for a total of $12,974.90.

Kindly reach out to us if you see any differences between this statement and your records.

Thank you in advance for your help.

Stefanie Jiang

HDMI LA

—
Powered by Tesorio.com.

# EXHIBIT I



HIGH-DEFINITION MULTIMEDIA INTERFACE

January 20, 2012

**DONGGUAN NAFNE ELECTRONIC TECHNOLOGY CO., LTD.**

**Benson Lin**

**#12 XiNan Lang Road,HeNan Industuries Zone,JinXia
Village,ChangAn Town**

**Dongguan Guangdong 523800**

**China**

RE:     <u>HDMI Notice of Breach of Agreement</u>

Dear **Benson Lin**,

In accordance with Section 9.10 of that certain HDMI Specification Adopter Agreement between **DONGGUAN NAFNE ELECTRONIC TECHNOLOGY CO., LTD.** and HDMI Licensing LLC ("HDMI Licensing"), HDMI Licensing hereby notifies **DONGGUAN NAFNE ELECTRONIC TECHNOLOGY CO., LTD.** of its breach of the Adopter Agreement.

Specifically, **DONGGUAN NAFNE ELECTRONIC TECHNOLOGY CO., LTD.** has failed to submit payment for Annual License fees for 2011 in accordance with section 7.1 of the adopter agreement.

Accordingly, **DONGGUAN NAFNE ELECTRONIC TECHNOLOGY CO., LTD.** has thirty (30) days from its receipt of this letter to cure such breach of the Adopter Agreement.  In the event that **DONGGUAN NAFNE ELECTRONIC TECHNOLOGY CO., LTD.** fails to cure such breach within such period, HDMI Licensing will immediately remove **DONGGUAN NAFNE ELECTRONIC TECHNOLOGY CO., LTD.** from the HDMI website, and terminate the Adopter Agreement.

Please note that, regardless of whether **DONGGUAN NAFNE ELECTRONIC TECHNOLOGY CO., LTD.** cures such breach within such period, HDMI Licensing reserves the right to conduct an audit of **DONGGUAN NAFNE ELECTRONIC TECHNOLOGY CO., LTD.** in accordance with Section 7.3.3 of the Adopter Agreement.

Please feel free to contact **Trudi Bordi**, by phone at **408-962-4268** or by facsimile at **408-830-9536 or by email at tbordi@hdmi.org** if you have any questions or comments with respect to this matter.

Sincerely,

HDMI Licensing, LLC
Steve Venuti
President

cc:     Burch Harper
        Legal Counsel
        HDMI Licensing, LLC

HDMI Licensing, LLC
1140 East Arques Avenue, Ste 100
Sunnyvale, CA 94085
T 408.616.1542
F 408.616.4013

# EXHIBIT J

# DEFENDANT Chunghsin Technology Group Co. Ltd. f/k/a New Century Optronics Co., Ltd. ("CNC")



















# DEFENDANT Changzhou Wujin Best Electronic Cables Co., Ltd. ("Best Cable")



# USB C HUB 6-IN-1



USB C

TF Card read port

SD Card read port

USB 3.0

USB 3.0

HDMI

C Connector
For Power Charging

## Using Your Hub

1. Connect to AC power
2. Connect to a host (laptop / phone / Desktop )
3. Connect to your devices

Note the insertion direction of SD card and TF card

JIANGSU BEST INTERNATIONAL TRADE CO.,LTD

PRODUCT
CERTIFICATION







**Dual USB Type C Hub with Power Delivery for Charging, one 4K HDMI Output and four USB 3.0 Ports**

- Designed for 2016 MacBook Pro w/ Thunderbolt 3 port - including 13" and 15" MacBook Pro
- Pro Hub's Thunderbolt 3 - up to 5k or 2x4k @ 60Hz video, up to 50Gb/s data speed; 2 USB 3.0 ports - 5Gb/s data speed; USB-C port - up to
- 10Gb/s data speed; SD/Micro card reader
- Slim & compact - the compact and easy-to-use design makes it simple to take the Type-C USB Hub with you anywhere you go
- Perfectly complements accessories - brushed aluminum design available in Space Gray and Silver
- Plug and play - does not require any software, drivers, or complicated

     



# DEFENDANT Shenzhen GYS Technology Co. Ltd.

## ("GYS")





# DEFENDANT Dongguan Lontion Electronic Technology d/b/a Juneed (Shenzhen) Technology Co., Ltd. ("Lontion")







1080P
HDTV

2 in 1 HDT
Wireless Display
Support 1080P

**DEFENDANT Dongguan Nafne Electronic Technology d/b/a Nan Feng and/or Nafne ("Nan Feng")**





东莞市南洋电子科技有限公司
Nan Feng Electronic Technology Co.,Ltd.

Booth NO: 61120

www.ergomy.cn



**USB TYPE-C**
**MULTI PORTS**
For the Diverse

TYPE C 40G DOCK
TYPE C PORT B
DP PORT 3840*2

**AOC SERIES**
**ACTIVE OPTICAL CABLE**
HIGH DATA RATE   LONG REACH HD

ACTIVE OPTICAL CABLE
8K / 60Hz / 4K / 120Hz
48GBPS / HDR / VRR / EARC
1080I / 1080P / 4K 60Hz
18GBPS / 3D / HDMI 2.2 / 1.4
100/200/300 METER OPTION

**VHDCI CABLE SERIES**

VHDCI CABLE AND DMS CABLE
VHDCI TO DVI*4/*3
VHDCI TO VGA*4/*3
DMS 59P TO DVI*2/VGA*2/HDMI*2/DP*2







